Concurring in the result without opinion Circuit Judge HUGHES.
Dissenting Opinion filed by Chief Judge PROST.
Dissenting Opinion filed by Circuit Judge DYK.
Dissenting Opinion filed by Circuit Judge REYNA.
MOORE, Circuit Judge.
I. Introduction
The current appeal results from a patent infringement suit and countersuit between Apple Inc. (“Apple”) and Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC (collectively, “Samsung”). Relevant to this en banc decision, the district court granted summary judgment that Samsung’s accused devices infringe the asserted claim of U.S. Patent No. 8,074,172 (“the '172 patent”). After a thirteen day trial, the jury found the asserted claim of U.S. Patent No. 5,946,647 (“the '647 patent”) infringed, and the district court denied Samsung’s requested judgment as a matter of law (“JMOL”). The jury also found the asserted claim of U.S. Patent No. 8,046,721 (“the '721 patent”) infringed and not invalid and the asserted claim of the '172 patent not invalid. The district court later denied Samsung’s requested JMOL and entered judgment accordingly.[1] Samsung appealed the district court’s grant of summary judgment of infringement as to the '172 patent, denial of JMOL of non-infringement as to the '647 patent, and denial of JMOL of obviousness as to the '721 and '172 patents.
II. Procedural Progress
A. The Decision to Grant En Banc Review
On February 26, 2016, a panel of this court reversed the denial of JMOL with regard to the jury verdict of infringement as to the '647 patent and non-obviousness as to the '721 and '172 patents. Apple filed a petition for rehearing en banc. Apple’s petition argued that the panel reversed the jury’s finding of infringement of the '647 patent by relying on extra-record evidence *1039 “none of which was of record and that the panel appears to have located only through independent research.” Apple Pet. 2. Apple argued that this extra-record extrinsic evidence was used to modify the agreed to and unappealed claim construction. See, e.g., id. at 8 (“The panel looked to [this extra-record evidence] to create its own plain meaning of ‘server’ as requiring a ‘stand alone’ program.”). Apple also argued that this extra-record evidence was used in “considering the factual question whether Samsung’s phones met the ‘analyzer server’ limitation.” See id. at 6, 8 (“The panel also relied on dictionary and encyclopedia entries to inform its understanding of how'the shared library code in Samsung’s phones work.” (emphasis in original)). Apple also argued that the case should be taken en banc because “in an unprecedented decision,” the panel reversed nearly every fact finding by the jury which favored Apple. Id. at 1.
We granted Apple’s en banc petition to affirm our understanding of the appellate function as limited to deciding the issues raised on appeal by the parties, deciding these issues only on the basis of the record made below, and as requiring appropriate deference be applied to the review of fact findings. There was no need to solicit additional briefing or argument on the question of whether an appellate panel can look to extra-record extrinsic evidence to construe a patent claim term. “The Supreme Court made clear that the factual components [of claim construction] include ‘the background science or the meaning of a term in the relevant art during the relevant time period.’” Teva Pharms., Inc. v. Sandoz, Inc., 789 F.3d 1335, 1342 (Fed. Cir. 2015) (quoting Teva Pharths., Inc. v. Sandoz, Inc., — U.S.-, 135 S.Ct. 831, 841, — L.Ed.2d-(2015)). After Teva, such fact findings are indisputably the province of the district court. We did not need to solicit additional briefing or argument to conclude that the appellate court cannot rely on extra-record extrinsic evidence in the first instance or make factual findings about what such extrinsic evidence suggests about the plain meaning of a claim term in the art at the relevant time or how such extra record evidence may inform our understanding of how the accused device operates. We likewise did not need additional briefing, or argument to determine that the appellate court is not permitted to reverse fact findings that were not appealed or that the appellate court is required to review jury fact findings when they are appealed for substantial evidence. The panel reversed nearly a dozen jury fact findings including infringement, motivation to combine, the teachings of prior art references, commercial success, industry praise, copying, and long-felt need across three different patents. It did so despite the fact that some of these findings were not appealed and without ever mentioning the applicable substantial evidence standard of review. And with regard to objective indicia, it did so in ways that departed from existing law.
The dissents, and Judge Dyk’s dissent in particular, raise big questions about how aspects of the obviousness doctrine ought to operate. But no party—at the panel or the petition for rehearing en banc stage— invited this court to consider changing the existing law of obviousness. We did not take this case en banc to decide important legal questions about the inner workings of the law of obviousness. We have applied existing obviousness law to the facts of this ease. We took this case en banc to affirm our understanding of'our appellate function, to apply the governing law, and to maintain our fidelity to the Supreme Court’s Teva decision.
B. The En Banc Decision
We affirm and reinstate the district court’s judgment as to the '647, '721, and *1040 172 patents. We conclude that the jury-verdict on each issue is supported by substantial evidence in the record and that the district court did -not err when denying Samsung’s respective JMOLs. Accordingly, we vacate the panel opinion and affirm the district court’s judgment with respect to these patents. We reinstate the panel opinion regarding U.S. Patent Nos. 6,847,-959, 7,761,414, 5,579,239, and 6,226,449. In all other respects, the panel decision is vacated. We have jurisdiction under 28 U.S.C. § 1295(a)(1).
III. Discussion
We review a district court’s order granting or denying JMOL under the standard applied by the regional circuit. In the Ninth Circuit, JMOL “is proper when the evidence permits only one reasonable conclusion and the conclusion is contrary to that of the jury.” See Monroe v. City of Phoenix, 248 F.3d 851, 861 (9th Cir. 2001). The Ninth Circuit explains that “[t]he evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party.” Id. The Ninth Circuit reviews a district court’s decision to grant or deny JMOL de novo. Id.
A. The '647 Patent
Apple asserted infringement of claim 9 of the '647 patent. The jury found that Samsung infringed and awarded Apple $98,690,625. J.A. 40869-79. The district court denied JMOL of non-infringement. J.A. 40-48.. Samsung argues the district court erred in not granting its motion for JMOL of non-infringement. Because there was substantial evidence to support the jury’s verdict, we affirm. “Substantial evidence ,.. means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.” Consol. Edison Co. of N.Y. v. N.L.R.B., 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938).
Infringement is a question of fact. Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1309 (Fed. Cir. 2009). Our review on appeal is limited to whether there was substantial evidence in the record to support the jury’s verdict. Id. We presume the jury resolved all underlying factual disputes in favor of the verdict. SSL Servs., LLC v. Citrix Sys., Inc., 769 F.3d 1073, 1082 (Fed. Cir. 2014).
The '647 patent discloses a system and method for detecting structures such as phone, numbers, addresses, and dates in documents, and then linking actions or commands to those structures. When the system detects a structure in a document, an “analyzer server” links actions to that detected structure. Actions include things such as placing a phone call or adding an address to an electronic address book. See '647 patent at 2:21-41. Apple asserted claim 9, which depends from claim 1:
1. A computer-based system for detecting structures in data and performing actions on detected structures, comprise ing:
an input device for receiving data;
an output device for presenting the data;
a memory storing information including program routines including

an analyzer sener for detecting structures in the data, and for linking actions to the detected structures-,

a user interface enabling the selection of a detected structure and a linked action; and
an action processor for performing the selected action linked to the selected structure; and .
a processing unit coupled to the input device, the output device, and the *1041 memory for controlling the execution of the program routines.
9. The system recited in claim 1, wherein the user interface enables selection of an action by causing the output device to display a pop-up menu of the linked actions.
'647 patent at 7:9-55 (emphasis added).
Samsung contends no reasonable jury could have found infringement based on our constructions of “analyzer server” and “linking actions to the detected structures.” We previously addressed the constructions of both terms in Apple, Inc. v. Motorola, Inc,, 757 F.3d 1286 (Fed. Cir. 2014) (“Motorola”), a separate litigation involving the '647 patent. Our Motorola opinion issued on the parties’ final day for presenting evidence at trial in this case. J.A. 42. During the Markman hearing, neither Apple nor Samsung had sought a construction of “analyzer server” or “linking actions,” and instead sought to rely on the plain and ordinary meanings of those terms. After Motorola issued, the parties agreed to give the Motorola constructions to the jury and reopen evidence to give both sides an opportunity to present expert testimony about the impact of the Motorola constructions on '647 infringement. J.A. 43. The jury was instructed as follows:
The term “analyzer server” means “a server routine separate from a client that receives data having structures from the client.”
The term “linking actions to the detected structures” means “creating a specified connection between each detected structure and at least one computer subroutine that causes the CPU to perform a sequence of operations on that detected structure.”
Final Annotated Jury Instrs., No. 22, Apple Inc. v. Samsung Elecs. Co., No. 5:12-cv-00630-LHK, 2015 WL 4967769 (N.D. Cal. Apr. 28, 2014), ECF No. 1848. Neither side objected to the jury instruction and neither side has appealed the constructions given to the jury. We address Samsung’s arguments for each term separately.
1. Analyzer Server
The only issue on appeal relating to the “analyzer server” limitation is whether there was substantial evidence to support the jury’s fact finding that Samsung’s accused devices satisfy this limitation under our Motorola construction. In Motorola, we construed “analyzer server” as “a server routine separate from a client that receives data having structures from the client.” Motorola, 757 F.3d at 1304. In Motorola, the court explained:
We agree with the district court’s construction of “analyzer server.” As the district court recognized, the plain meaning of “server,” when viewed from the perspective of a person of ordinary skill in the art, entails a client-server relationship. Consistent with this perspective, the specification discloses an analyzer server that is separate from the application it serves. The analyzer server is part of the “program 165 of the present invention.” '647 patent at col. 3, 11. 38-39. Fig. 1 shows the program 165 and the application 167 as separate parts of a random-access memory (RAM):
*1042 [[Image here]]
Id. at Fig. 1. Further, the specification states that “the program 165 of the present invention is stored in RAM 170 and causes CPU 120 to identify structures in data presented by the application 167.” Id. at col. 3, 11. 37-41. Thus, the specification describes the analyzer server and the application, which it serves, as separate structures.
Id. at 1304-05 (red box annotation to figure added).[2] This court explained that the '647 patent’s separate requirement for the analyzer server is met when the “program 165” and “application 167” are stored in “separate parts of random access memory.” Id. As we explained, Figure 1 of the patent “shows the program 165 and the application 167 as separate parts of a random-access memory (RAM)” and they are thus “separate structures.” Id. Under the Motorola claim construction, the program and application satisfied the separate requirement because they were structurally separate, i.e., located in different parts of the RAM. In this case, the parties agreed that the Motorola construction be given to the jury, and neither party appealed that construction.
The panel, however, used extra-record extrinsic evidence to modify the agreed upon and unappealed construction of “analyzer server.”[3] Panel Op. at 8, 10 n.5. It *1043 held that Samsung’s accused systems did not infringe because “the Samsung software library programs are not ‘standalone’ programs that run separately.” Panel Op. at 13. Neither party asked for this changed construction.[4] And there is no foundation in Motorola for it.
The dissents claim that Apple agreed to a new construction during oral argument.[5] The dissents take Apple’s statement out of context. When Apple’s counsel stated that the analyzer server runs separately, he was explaining that the analyzer server runs in its own location in memory; the shared library code is not copied into and run as part of the client application. See Oral Arg. at 29:15-30:25. “The big fight was this, this was the big fight, does the code from the analyzer server get copied and become part of the analyzer server where it is run, or is there one copy of the code, and it is run at the analyzer server separately at the analyzer server as a part of a separate routine.” Id. at 44:55. Apple’s counsel repeatedly and clearly rejected the panel’s suggestion that “separate” means a standalone program which runs separately. “There is no requirement in the claim interpretation that it run as a standalone program.” Oral Arg. at 34:55.[6] Apple argued that the panel’s proposed interpretation of “separate” was “a new claim construction that’s actually more specific and different than the jury charge. No one has urged you to do that. There is no suggestion that the claim interpretation is wrong.” Id. at 45:45.[7] Apple reiterated its objection to the panel’s modified construction in its Petition for Rehearing.[8]
Claim construction was not appealed and we do not agree that Apple agreed to the panel’s change to the construction of analyzer server. Even Samsung’s counsel agreed, “[Apple] is correct that we are not *1044 disputing the claim construction.” Oral Arg, at 1:12:40. We thus return to our Motorola construction which was agreed upon by the parties in this case, given to the jury, and not appealed: “analyzer server” is “a server routine separate from a client that receives data having structures from the client.” We evaluate whether there is substantial evidence for the jury’s finding of infringement under that construction.[9]
On appeal, Samsung argues no reasonable jury could have found its accused devices meet the “analyzer server” limitation because the accused devices do not contain a server routine “separate” from the client application. Samsung Br. 16-25. It argues that “the uncontested evidence at trial showed that the Browser and Messenger applications each contain their own routines within the application for analyzing the data (ie., performing the detecting and linking functions) and do not rely on a separate server.” Id. at 18 (emphasis in original). It argues that in its accused devices, when a client application needs shared library code, “it will copy it from the library and it will run as part of the application.” Id. at 19. It cites the testimony of its expert, Dr. Jeffay, that “[y]ou go to the library, you take code out of the library, you integrate it in your application, and at that point the library code is no different than any other code in the application.” Id. at 21.
There is no real dispute regarding whether the shared library code in the accused devices performs all the claimed functionality—the dispute is where'it performs those functions. Samsung contends the shared library code in its devices is copied and incorporated into the client application, so when the code is run, it runs as part of the client application. Therefore, its shared library code is not “separate” from the client application.
Apple contends the shared library code in Samsung’s accused devices is never copied but rather remains at the library. It contends that, when a client application wishes to use Samsung’s shared library code, the application goes to the shared library and uses the code there. Therefore, Samsung’s shared library code is “separate” from the client.
We limit our appellate review to the evidence of record before the district court. On this record, we hold that substantial evidence supports the jury’s finding that Samsung’s accused devices contain “a server routine separate from a client that receives data having structures from the client.”' See Motorola, 757 F.3d at 1304.
Apple’s expert, Dr. Mowry, testified that the “analyzer server” in the accused devices is shared library code,.and the client applications are the Browser and Messaging applications. J.A. 13030:4-22. He testified that Samsung’s shared library code and client applications are “separate” because they are located in separate parts of *1045 memory: “the shared libraries are developed independently of the application” and are “designed to be reused across different applications.” J.A. 13035:12-18, 13036:13-20. He explained that “there’s only one copy of the shared library code,” and when client applications in Samsung’s accused devices wish to use the library code, “those applications go to that code and use it where it is each time they want to, access that code.” J.A. 13035:22-25. He testified that, in the accused devices, one copy of shared library code may be shared by “20 or 100” different applications, J.A. 13036:13-20, and that, in order for an application to use the library code, the application must “go to the shared library code in the one place that exists in the- computer memory hardware to use it.” Id.; see also J.A. 13037:1-6 (“It has access to the code and it goes to the code where it is and uses it there, and it does that each time that it accesses the code.”). Dr. Mowry also testified that the client applications and shared library code in the accused devices are stored “in a different part of the address base.” J.A. 13036:1-2. He concluded that the shared library, code and client programs in the accused devices are “definitely separate.” J.A. 13036:20.
On this record, this is substantial evidence to support the jury’s finding that the accused devices meet the “analyzer server” limitation. Dr. Jeffay provided contrary testimony to Dr. Mowry, but the jury was in the best position to determine whether it found Dr. Mowry or Dr. Jeffay more persuasive. See, e.g., MobileMedia Ideas LLC v. Apple Inc., 780 F.3d 1159, 1168 (Fed. Cir. 2015) (“[W]hen there is conflicting testimony at trial, and the evidence overall does not make only one finding on the point reasonable, the jury is permitted to make credibility determinations and believe the witness it considers more trust worthy.”).[10] We see no error in the district court’s conclusion that substantial evidence supported the jury verdict with respect to this limitation.
2. Linking Actions
Samsung also appealed the district court’s denial of JMOL of non-infringement based upon the “linking actions” limitation. We hold that there was substantial evidence to support the jury’s finding that the accused devices meet the “linking actions” limitation under our construction in Motorola.
In Motorola, we construed “linking actions to the detected structures” as “creating a specified connection between ■ each detected structure and at least one computer subroutine that causes the CPU -to perform a sequence -of operations on that detected structure.” Motorola, 757 F.3d at 1307. On appeal, Samsung argues there is no “specified connection” in the accused devices between a user’s request to perform some action and the application that *1046 ultimately performs the requested action. More specifically, Samsung argues the “startActivity()” subroutine—the accused “computer subroutine” in Samsung’s products—does not satisfy the specified connection requirement. Samsung Br. 27. It argues startActivity() merely determines which application will perform the requested action rather than performing the task itself. Id. at 29. Thus, a “specified connection” to the startActivity() subroutine would not- infringe because there is no connection to the application that ultimately performs the task. Id.
This argument can be illustrated through an example. Android (the operating system run on the accused phones) phones typically contain multiple applications capable of sending emails. When a user inputs a command to send an email, the phone prompts the user to select an available application to send the email. There may be two or three available applications; the user selects which application to use. Samsung contends this is not a “specified connection” because the user’s command is not tied to a particular application that performs the command. See Samsung Br. 28; J.A. 11586:1-11587:6 (trial testimony of Dianne Haekbom, Google engineer). It argues- there is “no evidence of any specified connection between detected structures and actions,” Samsung Br. 26 (emphasis added).
Our claim construction, however, does not require a specified connection between detected structures and the applications that perform operations oh them. It requires a specified connection between detected structures and the computer subroutine that causes the CPU to perform the operations. The district court made this observation in its JMOL order: “The Motorola construction of ‘linking actions,’ however, requires only that the detected structure be linked to a ‘computer subroutine that causes the CPU to perform’ that function.” J.A. 45 (emphasis in original). The court quoted and rejected Samsung’s argument that “no specified connection exists because claim 9 requires that ‘you link the actual program that performs that function,’ such as dialing a phone number.” Id. (quoting Dr. Jeffay).
We agree with the district court that Apple presented substantial evidence that the accused devices contain a specified connection between a detected structure and a computer subroutine that causes the CPU to perform a sequence of operations. In the accused devices, the detected structure is an object in the data, such as a phone number or email address. J.A. 10854:11-25,10858:3-12. And the computer subroutine is a method called “startActivity().” J.A. 13040:25-13041:4. Dr. Mowry testified that the phone numbers and email addresses form part of an Intent object. J.A. 10858:3-12. When a user wishes to perform some action in the accused devices (such as place a phone call or send an email), a method called setlntent() passes the Intent object to the startActivity() subroutine. J.A. 13040:6-23.[11] Dr. Mowry explained that if a “program wants to open another program, it uses an Intent object.” J.A. 10861:4-6. He described startActivity() as the “launcher” that launches other programs to perform the requested action. J.A. 10858:13-20. For example, if a user wishes to make a phone call, the startAc-tivity() subroutine launches the user’s selected dialing application. See J.A. 10861:4-10.
According to Dr. Mowry, startActivity() is “the computer subroutine that causes the CPU to perform a sequence of opera *1047 tions on that detected structure,” as our construction requires. J.A. 13040:25-13041:4. Dr. Mowry testified that startAc-tivity() is “necessarily” called when a user selects a particular action. J.A. 13040:6-23, 13041:7-16. He explained that “if the user picks a particular option, that information will'be passed to another procedure shown on the bottom, which is called Start Activity, and that is the launcher.” J.A. 10858:13-20. He testified that “you get different behaviors from Start Activity based on how you fill in the fields in the Intent object. So that causes the different actions to occur.” J.A. 13042:25-13043:2. A reasonable jury could have relied on this testimony to find that Samsung’s accused devices meet the linking actions limitation. See J.A; 45 (“[T]he jury could have determined that startActivity() satisfies this limitation because it is admittedly a linked subroutine that causes performance of an action.”).[12]
In the Ninth: Circuit, JMOL “is proper when the evidence permits only one reasonable conclusion and the conclusion is contrary to that of the jury.” Monroe, 248 F.3d at 861. Dr. Mowry’s testimony provided substantial evidence of infringement. In light of Dr. Mowry’s testimony, we cannot conclude that the evidence permits only one reasonable conclusion which is contrary to the jury verdict. We see no error in the district court’s denial of JMOL of non-infringement.
The judgment of validity of the '647 patent was not appealed. We affirm the district court’s denial of JMOL as to this patent.
B. The '721 Patent
Apple asserted infringement of claim 8 of the '721 patent. The jury entered a verdict that claim' 8' was infringed and would not have been obvious. J.A. 40872, 40874. Samsung challenges the district court’s denial of JMOL that claim 8 would have been obvious. We agree with the district court that there was substantial evidence to support the jury’s underlying fact findings and that these fact .findings supported the conclusion that Samsung failed to establish by clear and convincing evidence that claim 8 would have been obvious.
Obviousness is a question of law based on underlying facts. Kinetic Concepts, Inc. v. Smith & Nephew, Inc., 688 F.3d 1342, 1356-57 (Fed. Cir. 2012). When reviewing a denial of JMOL of obviousness, where there is a black box jury verdict, as is the case here, we presume the jury resolved underlying factual disputes in favor of the verdict winner and leave those presumed findings undisturbed if supported by substantial evidence. Id. We then examine the legal conclusion de novo in light of those facts. Id. at 1357.
In Graham v. John Deere Co., 383 U.S. 1, 17-18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), and KSR Int’l Co. v. Teleflex Inc., 550 U.S. 398, 406, 127 S.Ct. 1727, 167 L.Ed.2d 705 (2007), the Supreme Court set out the framework for the obviousness inquiry under 35 U.S.C. § 103:
Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the *1048 pertinent art resolved. Against this background, the obviousness or nonobvi-ousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented.
A determination of whether a patent claim is invalid as obvious under § 103 requires consideration of all four Graham factors, and it is error to reach a conclusion of obviousness until all those factors are considered. In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig., 676 F.3d 1063, 1075-76 (Fed. Cir. 2012) (citing Richardson-Vicks Inc. v. Upjohn Co,, 122 F.3d 1476, 1483 (Fed. Cir. 1997)),[13] Objective indicia of nonobviousness must be considered in every case where present. See, e.g., Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc., 699 F.3d 1340, 1349 (Fed. Cir. 2012) (“[Evidence rising out oí the so-called ‘secondary considerations’ must always when present be considered en route to a determination of obviousness.” (quoting Stratoflex, Inc. v. Aeroquip Corp., 713 F.2d 1530, 1538 (Fed. Cir. 1983))); Simmons Fastener Corp. v. Illinois Tool Works, Inc., 739 F.2d 1573, 1575 (Fed. Cir. 1984) (“The section 103 test of nonobviousness set forth in Graham is a four part inquiry comprising, not only the three familiar elements (scope and content of the prior art, differences between the prior art and the claims at issue, and level of ordinary skill in the pertinent art), but also evidence of secondary considerations when such evidence is, of course, present.”). This requirement is in recognition of the fact that each of the Graham factors helps inform the ultimate obviousness determination. Kinetic Concepts, 688 F.3d at 1360; Nike, Inc. v. Adidas AG, 812 F.3d 1326, 1340 (Fed. Cir. 2016) (holding that evidence of secondary considerations must be examined to determine its impact on the first three Graham factors).
The '721 patent discloses a portable device with a touch-sensitive display that can be “unlocked via gestures” performed on the screen. '721 patent at Abstract. The patent teaches that a “problem associated with using touch screens on portable devices is the unintentional activation or deactivation of functions due to unintentional contact with the touch screen.” Id. at 1:38-40. “Unintentional activation or deactivation of functions due to unintentional contact with the touch screen” is commonly referred to as “pocket dialing.” See, e.g., J.A. 10638:9-13 (Andrew Cockburn) (describing the “pocket dial problem”); Apple Br. 25 (“Apple’s '721 patent discloses a user-friendly solution to the problem of accidental activation of mobile touchscreen devices (e.g., ‘pocket dialing’).”). Greg Christie, an inventor of the '721 patent, described the problem he and his colleagues set out to solve:
[W]e were worried about accidental use, pocket dialling [sic], the phone getting shut down accidentally, or since we were going to have all these features on the phone, like e-mail and messaging, we were worried that, you know, mail could be sent accidentally or deleted accidentally or the phone would answer itself simply because the touch surface—you know, if it was like, like, the touch sur *1049 face against your leg in your pocket, we were worried that just, like, you know, jostling around, moving around would trigger things on the screen.
J.A. 10601:4-13.
The '721 patent also describes the importance of making phone activation as “user-friendly” and “efficient” as possible. It teaches:
Accordingly, there is a need for more efficient, user-friendly procedures for unlocking such devices, touch screens, and/or applications. -More generally, there is a need for more efficient, user-friendly procedures for transitioning such devices, touch screens, and/or applications between user interface states (e.g.; from a user interface state for a first application to a user interface state for a second application, between user interface states in the same application, or between locked and unlocked states). In addition, there is a need for sensory feedback to the user regarding progress towards satisfaction of a user input condition that is required for the transition to occur.
'721 patent at 1:56-67. Mr. Christie testified that the ease of the user interface was a central design consideration when developing the slide to unlock feature:
[W]e thought to introduce some sort of definite gesture. We knew we wanted to have some instruction. We knew we wanted the interface to be obvious to the customer. It would be possibly the first experience even in a retail environment. They’re deciding whether they want to buy it. They pick up this iPhone, you know, it would be very bad if they looked at the phone that they had heard so much about and they look at it and •say “I can’t figure out how to use this. I don’t know how to unlock it. It’s locked.” At the same time, we knew that people would be unlocking their phone, you know, tens or hundreds of times a day, so we didn’t want the instruction to be, you know, insulting or talk down to the customer, We didn’t want it ,to be cumbersome, something that they would grow tired of after a while.
J.A. 10602:6-20. Apple’s expert, Dr. Cock-burn, explained that there was a tension between preventing pocket dialing and ease of use: “... [I]t has to work. It has to succeed in preventing accidental activation by mistake. But yet it needs .to be something that’s easy to do,, but not so easy that it can occur by accident, and it succeeds in that.” JA.. 10639:19-23.
Apple asserted claim 8, which depends from claim 7, against several Samsung devices. These claims recite:
7. A portable electronic device, comprising:
a touch-sensitive display;
memory;
one or more processors; and
one or more modules stored in the memory and configured for execution by the one or more processors, the one or more modules including instructions:
to detect a contact vrith the touch-sensitive display at a first predefined location corresponding to an unlock image;
to continuously move the unlock image on the touch-sensitive display in accordance with the movement of the detected contact while continuous contact with the touch-sensitive display is maintained, wherein the unlock image is a graphical, interactive user-interface object with which a user interacts in order to unlock the device; and
to unlock the hand-held electronic device if the unlock image is moved from the first predefined location on *1050 the touch screen to a predefined unlock region on the touch-sensitive display.
8. The device of claim 7, further comprising instructions to display visual cues to communicate a direction of movement of the unlock image required to unlock the device.
The jury found that Samsung’s accused devices infringed claim 8 of the '721 patent. J.A. 40872. Samsung does not appeal this aspect of the verdict. The jury also found that Samsung’s infringement was willful and that Samsung failed to prove by clear and convincing evidence claim 8 is invalid. J.A. 40874. Following the verdict, Samsung moved for JMOL that, inter alia, claim 8 would have been obvious and Samsung did not willfully infringe the claim. The district court denied Samsung’s motion as to obviousness but granted the motion as to willfulness.
Samsung argues claim 8 would have been obvious in light of the combination of Neonode and Plaisant. “Neonode” refers to the Neonode N1 Quickstart Guide. J.A. 20713. Neonode discloses a mobile device with a touch-sensitive screen. It explains that a user may unlock the device by pressing the power button. After the user presses the power button, text appears instructing the user to “Right sweep to unlock.” Sweeping right then unlocks the unit. J.A. 20725.
“Plaisant” refers to a video and corresponding two-page paper published in 1992 titled “Touchscreen Toggle Design” by Catherine Plaisant and Daniel Wallace. J.A. 20742. The authors of the paper conducted an experiment to determine which controls (“toggles”) users prefer on wall-mounted controllers for “entertainment, security, and climate control systems.” Id. These controllers were intended to be installed “flushmounted into the wall or the cabinetry.” Id. The authors presented six alternative unlocking mechanisms to a group of fifteen undergraduate students, including a “slider toggle” where a user could activate the controller by “grab[bing] the pointer and sliding] it to the other side.” J.A. 20743. The students preferred “toggles that are pushed” over “toggles that slide,” and generally ranked the slider fifth of the six alternatives. Id. The paper also notes that sliders “were not preferred,” “sliding is a more complex task than simply touching,” and that “sliders are more difficult to implement than buttons.” Id.
On appeal, Apple does not contest that, together, Neonode and Plaisant disclose all the elements of claim 8.[14] Rather, the parties dispute whether a person of ordinary skill in the art would have been motivated to combine one of the unlocking mechanisms disclosed in Plaisant with Neonode. Samsung argues “there was no evidence of any kind suggesting that Plais-ant’s application to a wall-mounted device would lead inventors not to combine Plais-ant with Neonode.” Samsung Resp. Br. 19-20. Its expert, Dr. Greenberg, testified that a person of ordinary skill “would be highly interested” in both references because “they both deal with touch base systems, they both deal with user interfaces.” J.A. 11982:13-17. Dr. Greenberg testified that “a person looking at this would just think it natural to combine these two, as well taking the ideas in Plaisant, the slider, and putting them on the Neonode is, is *1051 just a very routine thing to think about in terms of interaction design.” J.A. 11982:23-11983:2. Samsung points to the Plaisant reference which states that sliding movement “is less likely to be done inadvertently.” Samsung Br. 35-36 (quoting J.A. 20743).
Apple counters that a skilled artisan designing a mobile phone would' not have been motivated to turn to a wall-mounted air conditioning controller to solve the pocket dialing problem. Apple Br. 26-27. Its expert, Dr. Cockburn, testified that a person of ordinary skill would not have been naturally motivated to combine Neo-node and Plaisant. J.A. 12877:17-21. Dr. Cockburn testified that the way the Plais-ant controllers “were intended to be used was the touch screen would be mounted into a wall or into cabinetry and it would be used to control, for remote control, office or home appliances, like air conditioning units or heaters.” J.A. 12876:20-23. He also explained to the jury that Plaisant itself discloses that sliding toggles were less preferred than the other switches disclosed. J.A. 12877:7-16. Apple points to Plaisant’s teachings that “sliders were not preferred,” “sliding is a more complex task,” and “sliders are more difficult to implement.” Apple Br. 27-28. Apple argues there was substantial evidence for the jury to conclude that there would not have been a motivation to combine Plaisant and Neonode to arrive at the claimed invention.
What a prior art reference teaches and whether a skilled artisan would have been motivated to combine references are questions of fact. See Par Pharm,, Inc. v. TWI Pharms., Inc., 773 F.3d 1186, 1196-97 (Fed. Cir. 2014); Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc., 617 F.3d 1296, 1303 (Fed. Cir. 2010). “Before KSR, we had also consistently treated the question of motivation to combine prior art references as a question of fact... KSR did not change this rule .... ” Wyers v. Master Lock Co., 616 F.3d 1231, 1238-39 (Fed. Cir. 2010); id. at 1237 (“[W]hether there was sufficient motivation to combine the references” is a • “factual issue[ ].”). The district court determined that a reasonable jury could have found that a person of ordinary skill would not have been motivated to combine Plaisant and Neonode:
A reasonable jury could infer from [Dr. Cockburn’s] testimony that an ordinary artisan would not have been motivated to combine elements from a wall-motmt-ed touchscreen for home appliances and a smartphone, particularly in view of the “pocket dialing” problem specific to mobile devices that Apple’s invention sought to address.
Additionally, Dr. Cockburn explained that Plaisant “teach[es] away from the use of sliding,” because it “tells you not to use the sliding [toggle] mechanism.”
J.A. 55 (citations omitted).[15] After noting that what a reference teaches is a question of fact, the district court discussed the various statements in Plaisant about sliding toggles and concluded that substantial evidence supports the jury’s fact findings that Samsung failed to establish a motivation to combine. J.A. 55-56. We agree with the district court that on this record, the *1052 jury’s implicit fact findings that Plaisant would not have provided a skilled artisan with a motivation to combine its slider toggle switch with Neonode is supported by substantial evidence. In addition to the statements in Plaisant, the court explained: .
Dr. Cockburn testified, contrary to Dr. Greenberg, that a person of ordinary skill in the art would not have been motivated to combine the Neonode and Plaisant in such a way as to invent claim 8. He provided two reasons. First, Plais-ant described “toggle designs” intended to be used with a “touch screen [that] would be mounted into a wall or into cabinetry” for controlling “office or home appliances, like air conditioning units or heaters.” A reasonable jury could infer from this testimony that an ordinary artisan would not have been motivated to combine elements from a wall-mounted touchscreen for home appliances and a smartphone, particularly in view of the “pocket dialing” problem specific to mobile devices that Apple’s invention sought to address.
J.A. 54-55 (citations omitted).
We agree with the district court’s analysis. Because the jury found the issue of validity in favor of Apple, we presume it resolved the conflicting expert testimony and found that a skilled artisan would not have been motivated to combine the slider toggle in Plaisant with the cell phone disclosed in Neonode. The question for our review is whether substantial evidence supports this implied fact finding. We conclude that it does. Neonode discloses a mobile phone. Plaisant discloses a wall-mounted air conditioning controller. The jury had both references before it- Although Samsung presents arguments for combining the two references, these ax-gu-ments were before the jury. Our job is not to review whether Samsung’s losing position was also supported by substantial evidence or to weigh the relative strength of Samsung’s evidence against Apple’s evidence. We are limited to determining whether there was substantial evidence for the jury’s findings, on the entirety of the record. And under the Ninth Circuit standard, we cannot conclude that the evidence affords only one reasonable conclusion and that it is contraxy to that of the jury. See Monroe, 248 F.3d at 801. We agree with the district court: “A reasonable jury could infer from this testimony that an ordinary artisan would not have been motivated to combine elements from a wall-mounted touchscreen for home appliances and a smartphone, particularly in view of the ‘pocket dialing’ problem specific to mobile devices that Apple’s invention sought to address.” J.A. 55.
1. The Objective Indicia of Non-Obviousness
The Supreme Court explained that various factors “may also serve to ‘guard against slipping into use of hindsight,’ and to" resist the temptation to read into the prior art the teachings of the invention in issue.” Graham, 383 U.S. at 36, 86 S.Ct. 684 (citation omitted). These factors are commonly known as secondary considerations or objective indicia of non-obviousness. These include: commercial success enjoyed by devices practicing the patented invention, industry praise for the patented invention, copying by others, and the existence of a long-felt but unsatisfied need for the invention. As this court held in Stratoflex:
Indeed, evidence of secondary considerations may often be the most probative and cogent evidence in the record. It may often establish that an invention appearing to have been obvious in light of the prior art was not. It is to be considered as part of all the evidence, *1053 not just when the decisionmaker remains in doubt after reviewing the art.
71S F.2d at 15B8-39. Apple introduced evidence of industry praise, copying, commercial success, and long-felt need. We presume the jury found that the evidence was sufficient to establish each by a preponderance of the evidence. We find substantial evidence, in the record to support each of those findings.
a. Industry Praise
Evidence that the industry praised a claimed invention or a product that embodies the patent claims weighs against an assertion that the same claimed invention would have been obvious. Industry participants, especially competitors, are not likely to praise an obvious advance over the known art. Thus, if there is evidence of industry praise of the claimed invention in the record, it weighs in favor of the non-obviousness of the claimed invention. See, e.g., Institut Pasteur & Universite Pierre Et Marie Curie v. Focarino, 738 F.3d 1337, 1347 (Fed. Cir. 2013) (¶⅞-dustry praise ... provides probative and cogent evidence that one of ordinary skill in the art would not have reasonably expected [the claimed invention].”); Power-One, Inc. v. Artesyn Techs., Inc., 599 F.3d 1343, 1352 (Fed. Cir. 2010) (noting that industry praise, and specifically praise from a competitor, tends to indicate that the invention would not have been obvious).
Samsung’s entire appeal regarding the jury’s fact finding that industry praise weighed in favor of nonobviousness is contained in one half of one sentence: “Indeed, the district court relied solely on generic praise not linked to the actual subject-matter of the claim .... ” Samsung Br. 37. The district court rejected Samsung’s argument on this issue, determining that substantial evidence supports the jury’s underlying findings in favor of “industry praise specifically for Apple’s slide to unlock invention.”. J.A. 56. It cited numerous internal Samsung documents that both praised Apple’s slide to. unlock feature and indicated that Samsung should modify its own phones to .incorporate Apple’s slide to unlock feature:
• PTX 119 at 11: presentation prepared by Samsung’s European design team in June 2009 with a picture of the iPhone stating that Apple’s slide to unlock invention is a “[creative way[] of splving UI complexity” and that “swiping unlock on the screen allows to prevent erroneous unlock,” J.A. 50950;
• PTX 121 at 100: Samsung software verification group document with a picture of the iPhone noting that unlike Samsung’s “Victory” phone, the iPhone’s “unlocking standard is precise as it is handled through sliding, and it allows prevention of any wrong motion,” and recommending a “direction' of improvement” to máke it the “same as iPhone, [and] clarify the unlocking standard by sliding,” J.A. 51289;
• PTX 157 at 19-20: Samsung document with a picture of the iPhone recommending improving the Samsung phone by making it “easy to unlock, [given that] lock screen always shows guide text or arrow like the iPhone” and to make the lock icon’s movement “be smooth and continuous” like the iPhone, J.A. 57 (JMOL Order citing PTX 157);
• PTX 219 at 14: Samsung document • with ¿ picture of the iPhone noting that the iPhone “intuitively indicate[s] the direction and length to move when unlocking on the lock screen,” J.A. 51603;
*1054 • PTX 120 at 28, 84: Samsung document with a picture of an iPhone that describes the “Direction of Improvement” as using a defined bar to unlock the phone, as is done on the iPhone. The same document describes the “Direction of Improvement” as displaying the unlock instruction on the screen, as is done on the iPhone. J.A. 51028, 51084.
See J.Ai 56-57 (JMOL Order citing several Samsung documents). Such internal documents from the patentee’s top competitor represent important admissions, acknowledging the merits of the patented advance over the then state of the art and can be used to establish ■ industry praise. Dr. Cockburn, Apple’s expert, testified “these various Samsung documents recognized the advantages of claim 8.” J.A. 57 (citing J.A. 10640-52).
The court also explained that Apple presented a video at trial showing Steve Jobs unveiling the slide to unlock feature at an Apple event. When Mr. Jobs swiped to unlock the phone, “the audience burst into cheers.” J.A. . 12879-80 (Andrew Cock-bum). The video was shown to the jury, and Apple’s expert, an inventor, and Apple’s Vice President of Marketing all referenced the video in their testimony. See J.A. 57 (JMOL Order citing 4/4/14 Tr. at 603:6-11 (Greg Christie)); J.A. 12879:17-12880:2 (Andrew Cockburn); 4/1/14 Tr. at 428:12-17 (Phillip Schiller) (“There were many press in attendance at the event, and the reaction was enormous.”).
Samsung does not discuss any of this evidence on appeal. In light of this evidence, we find its argument that the district court cited only generic praise of the iPhone, and not praise tied to the claimed slide to unlock feature, is without merit. The jury was presented with substantial evidence of praise in the industry that specifically related to features of the claimed invention, thereby' linking that industry praise with the patented invention.
b. Copying
Samsung does not dispute in its briefing that the jury heard substantial evidence that it copied the iPhone’s claimed features. In other words, Samsung does not challenge on appeal that substantial evidence exists in the record that Samsung copied Apple’s slide to unlock feature, nor does it challenge on appeal that this evidence of copying supports a conclusion that claim 8 would not have been obvious. Apple cites the same Samsung internal documents for both industry praise and copying, as they show evidence of both. The record contains multiple internal Samsung presentations given by different Samsung groups at different times stating that the iPhone’s slide to unlock feature is better than the various Samsung alternatives. See supra J.A. 50950 (PTX 119); J.A. 51028, 51084 (PTX 120); J.A. 51289 (PTX 121); J.A. 57 (JMOL Order citing PTX 157); J.A. 51603 (PTX 219). And many of these same presentations conclude that the direction for improvement is for Samsung to modify its unlocking mechanism to be like the iPhone. See id. This is substantial evidence of copying by Samsung, and it supports the jury’s verdict that the claimed invention would not have been obvious.
c. Commercial Success
In its opening appellate brief, Samsung also glosses over commercial success, giving it one sentence: “Apple made no effort to establish a nexus between commercial success and the subject matter of claim 8.” Samsung Br. 37. Commercial success requires a nexus to the claimed invention. Transocean, 699 F.3d at 1350. We look to the record to ascertain whether there is substantial evidence for the jury’s *1055 fact finding that Apple established a nexus between commercial success and the invention in claim 8.
At trial, Apple’s expert, Dr. Cock-bum, testified that the iPhone practiced the asserted claim of the '721 patent, and “clearly there’s been commercial success of the iPhones that use this invention.” J.A. 12879:20-22; see also J.A. 11984:24-25 (“[Tjhere’s no question that the Apple iPhone was a commercial success.”) (Saul Greenberg, Samsung’s expert). Critically, Apple presented survey evidence that customers would be less likely to purchase a portable device without the slide to unlock feature and would pay less for products without it, thus permitting the jury to conclude that this feature was a key driver in the ultimate commercial success of the products.[16] J.A. 21066, 21108. Apple’s Senior Vice President of Worldwide Marketing testified that slide to unlock was the very first feature shown in Apple’s original iPhone TV commercial, 4/1/14 Tr. at 433:16-434:18 (Phillip Schiller) (citing PTX 180), and the jury saw that commercial during the trial. Id. A reasonable jury could have found evidence that Apple’s marketing experts elected to emphasize the claimed feature as evidence of its importance. It is likewise reasonable to conclude that advertising that highlights or focuses on a feature of the invention could influence customer purchasing decisions. And an inventor of the '721 patent—an Apple Vice President—confirmed that slide to unlock was important because it “would possibly be [a customer’s] first experience even in a retail environment” when the customer was “deciding whether they want to buy it.” J.A. 10601:25-10602:22 (Greg Christie).[17] Mr. Schiller explained the importance of the slide to unlock feature in great detail:
When this ad ran, people hadn’t had the opportunity yet to actually use an iPhone for themselves, and so they’ve never used at this point in time a device anything like it. The challenge is how do you show people, in a simple, 30-second ad, something that gives them a feel for what it’s like to use this new generation of Apple’s smartphone. And we started the ad with something you’re going to be doing every day, many, many times a day, which is to unlock the screen, and to do that, you use a simple gesture, slide to unlock. And that one gesture, having seen that one thing first, you get an instant idea of how multitouch works *1056 so that you’re doing a gesture on the screen, and it does something simple and useful to you, and that it’s easy to use. You don’t need a manual to figure it out. And that one starting point was. a great beginning to your understanding of what an iPhone is and what this kind of device can do.
4/1/14 Tr. at 433:1-18. Finally, the video of the crowd “bursting] into cheers” when Steve Jobs demonstrated the slide to unlock feature supports a conclusion that consumers valued this particular feature. J.A. 12879:20-12880:2 (Andrew Cockburn). It is the fact finders’ job to assess the probative value of the evidence presented. Pro-Mold & Tool Co. v. Great Lakes Plastics, Inc., 75 F.3d 1568, 1574 (Fed. Cir. 1996) (“If is within the province of the fact-finder to resolve these factual disputes regarding whether a nexus exists between the commercial success of the product and its patented features, and to determine the probative value of Pro-Mold’s evidence of secondary considerations —”).
This record overall contains substantial evidence of a nexus between the slide to unlock feature and the iPhone’s commercial success, and we are required to give this jury fact finding deference. It is not our role to reweigh the evidence or consider what the record might have supported. This commercial success evidence supports the jury’s verdict that the claimed invention would not have been obvious.
d. Long-Felt Need
Evidence of a long-felt but unresolved need can weigh in favor of -the non-obviousness of an invention because it is reasonable to infer the need would not have persisted had the solution been obvious. There is substantial evidence for the jury to have found that there was a long-felt but unresolved need for a solution to the pocket dialing problem until Apple’s claimed invention, with its slide to unlock feature, solved that problem. Samsung’s appeal of the jury’s fact finding of long-felt need was limited to a single sentence, which was itself simply a quote from George M. Martin Co. v. All. Mach. Sys. Int’l LLC, 618 F.3d 1294, 1304 (Fed. Cir. 2010): “[w]here the differences between the prior art and the claimed invention are as minimal as they are here, ... it cannot be said that any long felt need was unsolved.” Samsung Br. 37 (alteration in original). In its brief, there was no application to this case, no analysis of the issue of long-felt need, and no citation to any record evidence.
To the extent that Samsung’s quote should be interpreted as precluding a jury finding of long-felt need favoring non-obviousness when the difference between the prior art and the claimed invention is small, we reject such a categorical rule. This type of hard and fast rule is not appropriate for the factual issues that are left to the province of the jury. There could be a long-felt need for what might be considered a relatively small improvement over the prior art—it all depends upon the evidence, and it is up to the fact finder to assess that evidence.
Moreover, we do not understand the quote from George M. Martin to be a proclamation of law but instead simply an application to the particular facts of that case. The quoted language makes clear that the court was evaluating the facts in that particular case regarding the claimed advances over the prior art, “as minimal as they are here.” George M. Martin, 618 F.3d at 1304. And importantly, the George M. Martin court explains that the “need” had already been met by the prior art devices that already solved the problem at issue. Id. at 1305. Thus, in George M. Martin, not only was the difference between the prior art and the claimed inven *1057 tion minimal, but the prior art had already solved the problem for which the patentee claimed there was a long-felt need. Id. Samsung’s sole argument on long-felt need is thus based, on a misreading of George M. Martin.
In this case, there is substantial evidence for the jury’s finding that long-felt need supported the nonobviousness of the claimed invention. Denying JMOL on this issue, the district court cited testimony from Apple’s expert: “Dr. Coekburn’s testimony that phone designers had been trying to solve the problem of accidental activation and the ‘pocket dial problem’ before the iPhone existed, but had only come up with ‘frustrat[ing]’ solutions.” J.A. 57 (quoting J.A. 10638-39). While the expert discusses particular examples in the first person: “I have been very frustrated with [the prior art options],” the jury could still reasonably find that this testimony was probative of a long-felt need. See J.A. 10638:17-19. .
The district court also cited the testimony of one of the inventors, where he discussed concerns over pocket dialing.[18] In addition to the portion of Dr. Cockburn’s testimony cited by the district court, there are other portions of his testimony upon which the jury fact finding could be predicated. The record contained á document (PTX 55) in which Samsung listed all the alternatives to the iPhone slide to unlock. See 4/4/14 Tr. at 680:10-687:15 (Andrew Cockburn). Apple’s expert went through several of the alternatives, including the Ripple unlock, the glass unlock, and the circle unlock, and explained how each of these failed to solve the accidental activation problem. Id. The jury could have reasonably found that this testimony established long-felt unresolved need.
In addition, the jury could have found that the same internal Samsung documents Apple relied upon for industry praise and copying demonstrate that Samsung compared four of its own rejected alternative unlock mechanisms (Kepler, Victory, Behold, & Amythest) to the iPhone slide to unlock mechanism, and that Samsung concluded the iPhone slide to unlock was better. See, e.g., J.A. 51028 (PTX 120 at 28 (“Behold3: Unintentional unlock occurs ,.. iPhone Lock undone only when sliding action is applied to a specific button”)); J.A. 51289 (PTX 121 at 100 (“Victory: The Screen Lock gets unlocked with a slight flick motion”; “iPhone Unlocking standard is precise as it is handled through sliding, and it allows prevention of any wrong motion”)). The jury could have found that these Samsung documents show that Samsung, Apple’s fiercest competitor, was unsuccessfully trying to solve the same problem. All of this evidence was presented to the jury during the trial in this case. This evidence constitutes substantial evidence for the jury fact finding that there was a long-felt but unresolved need, which Apple’s '721 patented invention solved. This evidence weighs in favor of non-obviousness.
*1058 2. Conclusion on Obviousness of the '721 Patent
Acknowledging that “it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does,” the Supreme Court cautioned that “[h]elpful insights, however, need not become rigid and mandatory formulas.” KSR, 550 U.S. at 418-19, 127 S.Ct. 1727. The Supreme Court explained:
The obviousness analysis cannot be confined by a formalistic conception of the words teaching, suggestion, and motivation, or by overemphasis on the importance of published articles and the explicit content of issued patents. The diversity of inventive pursuits and of modern technology counsels against limiting the analysis in this way.
Id. at 419, 127 S.Ct. 1727. “Rigid preventative rules that deny factfinders recourse to common sense, however, are neither necessary under our case law nor consistent with it.” Id. at 421, 127 S.Ct. 1727. With these principles in mind, we review de novo the ultimate legal determination and conclude that it would not have been obvious to a skilled artisan to combine the prior art to arrive at the claimed invention.
Common sense and real world indicators indicate that to conclude otherwise would be to give in to hindsight, to allow the exact ex post reasoning against which the Supreme Court cautioned in Graham and KSR. The record includes Plaisant and Neonode and all that these references teach, including Plaisant’s reference to inadvertent activation, complexity, difficult implementability, and that users do not prefer sliders. Though the prior art references each relate to touchscreens, the totality of the evidence supports the conclusion that it would not have been obvious for a skilled artisan, seeking an unlock mechanism that would be both intuitive to use and solve the pocket dialing problem for cell phones, to look to a wall-mounted controller for an air conditioner. The two-page Plaisant paper published in 1992 reported the results of a user-preference survey of fifteen undergraduates on six different computer-based switches. That a skilled artisan would look to the Plaisant paper directed to a wall-mounted interface screen for appliances and then choose the slider toggle, which the study found rated fifth out of six options in usability, to fulfill a need for an intuitive unlock mechanism that solves the pocket dialing problem for cell phones seems far from obvious.
We have considered the jury’s implicit fact findings about the teachings of Plais-ant and Neonode. We have also considered the objective indicia found by the jury which are particularly strong in this case and powerfully weigh in favor of validity. They include copying, industry praise, commercial success, and long-felt need. These real world indicators of whether the combination would have been obvious to the skilled artisan in this case “tip the scales of patentability,” Graham, 383 U.S. at 36, 86 S.Ct. 684, or “dislodge the determination that claim [8 would have been] obvious,” KSR, 550 U.S. at 426, 127 S.Ct. 1727. Weighing all of the Graham factors, we agree with the district court on the ultimate legal determination that Samsung failed to establish by clear and convincing evidence that claim 8 of the '721 patent would have been obvious. We affirm the district court’s denial of JMOL.
3. Willfulness
Apple appealed the district court’s grant of JMOL that Samsung did not willfully infringe claim 8 of the '721 patent. The district court’s decision was solely based on its determination that Samsung’s defenses were objectively reasonable under *1059 the standard from In re Seagate Tech., LLC, 497 F.3d 1360, 1371 (Fed. Cir. 2007). J.A. 63-66. Given -the Supreme Court’s recent willfulness decision in Halo Elecs., Inc. v. Pulse Elecs., Inc., — U.S.-, 136 S.Ct. 1923, 195 L.Ed.2d 278 (2016), we remand the willfulness issue for the district court to consider under the new standard in the first instance.
C. The ■'172 Patent
Apple moved for summary judgment of infringement of claim 18 of the '172 patent, which the district court granted. The jury entered a verdict that claim 18 of the '172 patent would not have been obvious..Samsung challenges the district court’s judgment of infringement which was based on the court’s construction of the term “keyboard.” It also challenges the district court’s denial of JMOL that claim 18 would have been obvious. We affirm both the judgment relating to infringement and that relating to invalidity.
The '172 patent is directed to a method, system, and interface for providing “auto-correct” recommendations to users inputting text into a portable electronic device. '172 patent at Abstract. Claim 18, the only asserted claim, recites a graphical user interface comprising “a first area” and “a second area” of a touchscreen. The “first area” displays the text, or “current character string,” input by the user. The “second area” displays both the “current character string” and a suggested replacement. Claim 18 provides a user with the option to accept the suggested replacement or keep the text as inputted. The user can accept the suggested replacement by activating a key on the keyboard (such as a spacebar) or by performing a gesture on the suggested replacement in the second area. The user can keep its inputted text by performing a gesture on the “current character string” in the second area. Claim 18 is recited below.
18. A graphical user interface on a portable electronic device with a keyboard and a touch screen display, comprising:
a first area of the touch screen display that displays a current character string being input by a user with the keyboard; and
a second area of the touch screen display separate from the first area that displays the current character string or a portion thereof and a suggested replacement character string for the current character string; wherein;
the current character string in the first area is replaced with the suggested replacement character string if the user activates a key on the keyboard associated with a delimiter;
the current character string in the first area is replaced with the suggested replacement character string if the user performs a gesture on the suggested replacement character string in the second area; and
the current character string in the first area is kept if the user performs a gesture in the second area on the current character string or the portion thereof displayed in the second area.
Before trial, Apple moved for summary judgment that Samsung’s accused devices infringe claim 18 of the '172 patent. In response, Samsung disputed only whether its accused devices satisfy claim 18’s requirement of a “keyboard.” The district court granted Apple’s motion, determining that Apple had shown infringement and that no reasonable jury could find that Samsung’s accused devices fell outside the court’s construction of “keyboard.” J.A. 164.
*1060 The jury trial proceeded on the issues of validity and damages. The jury found claim 18 of the '172 patent was not invalid and awarded Apple $17,943,750 for infringement by Samsung’s accused devices. J.A. 40874-76. Samsung moved for JMOL, arguing that no reasonable jury could find that claim 18 of the '172 patent is not invalid. In its motion, Samsung argued that claim 18 would have been obvious over the combination of U.S. Patent No. 7,880,730 (“Robinson”) and International Publication No. WO 2005/008899 (“Xrgom-ics”). The district court denied Samsung’s motion, determining that substantial evidence supported the jury’s fact findings related to obviousness and concluding that these fact findings supported the conclusion that Samsung had failed to prove by clear and convincing evidence that the '172 patent was invalid. J.A. 67-69.
On appeal, Samsung argues the district court erred by denying its motion for JMOL that the '172 patent would have been obvious over Robinson and Xrgomics. Samsung also argues the district court erred in construing “a keyboard and a touchscreen display” to encompass both physical and virtual keyboards, resulting in the district court’s erroneous grant of summary judgment that Samsung’s devices infringe claim 18 of the '172 patent. We consider each argument in turn.
1. Obviousness
Robinson, titled “Keyboard system with automatic correction,” is directed to “an enhanced text entry system that uses word-level disambiguation to automatically correct inaccuracies in user keystroke entries.” Robinson at 3:24-26 (J.A. 20910). Xrgomics, titled “Letter and word choice text input method for keyboards and reduced keyboard systems,” is directed to a “method for entering text efficiently by providing letter or word choices.” Xrgomics at Abstract (J.A. 21000). The parties presented the jury with expert testimony on both references and on objective indicia of non-obviousness.
Samsung’s expert, Dr. Wigdor, testified that Robinson discloses every limitation of claim 18 of the '172 patent except the limitation requiring a “current character string in the first area.” J.A. 12024:5-12025:9, Dr. Wigdor further testified that “anyone who’s used a computer since the 1970s would be familiar with this idea that ... as you type, the text shows up at your cursor.” J.A. 12025:1-9. He testified that one example of prior art that discloses the limitation missing from Robinson, a “current character string in the first area,” is Xrgomics. J.A. 12025:1-11. Dr. Wigdor stated that Figure 5 of Xrgomics, like claim 18, displays the inputted text “deva” both where the user is typing and in the suggestions bar. J.A. 12026:3-19. He álso testified that a person of ordinary skill in the art would have combined Robinson with Xrgomics to render claim 18 obvious. J.A. 12027:1-21.
Apple’s expert, Dr. Cockburn, disagreed on the scope and content of the prior art. He testified that Robinson fails to disclose “a series of elements” in addition to lacking the “current character string in the first area” limitation. J.A. 12915:24-12916:15. According to Dr. Cockburn, because Robinson does not display the text when the user types the characters in the first area, Robinson fails to disclose any of claim 18’s options for replacing or keeping the “current character string.” In particular, he testified that Robinson does not disclose that the “current character string in the first area is replaced,” either by activating a key on the keyboard or by performing a gesture on the suggested replacement, because in Robinson, “there was no text there to be replaced.” J.A. 12916:6-13. Likewise, Dr. Cockburn testi- *1061 fled that “because the current character string is not there [in Robinson], it can’t be kept if the user performs a gesture.” J.A. 12916:14-15.
Dr. Cockburn testified that Xrgomics does not disclose these missing elements. He testified that Xrgomics is not directed to spelling correction, but is a “word completion patent,” where a user can “type a series of characters and. Xrgomics offers alternative words that complete that word.” J.A. 12916:22-25. Using, the same example as Samsung’s expert, Dr. Cock-burn testified that Xrgomics does not teach correcting the spelling of “deva,” but suggests the words “devastating, devalue, devastate, all of which are completions of what the user - has already typed.” J.A. 12917:11-15. He testified that Xrgomics, like Robinson, therefore does not disclose “the current character string in the first area is replaced with the suggested replacement string,” because “[i]n Xrgomics, if the user presses the space bar.... D-EV-A is kept. There’s no replacement.” J.A. 12917:18-12918:2.
On objective indicia of non-obviousness, Samsung’s expert testified, “its clear to me that none of those secondary considerations were met.” J.A. 12032:14-15. Dr. Wigdor testified that, while the iPhone is commercially successful, it does not have the user interface specifically recited in claim 18. J.A. 12032:17-24. Apple’s expert, Dr. Cockburn, disagreed, stating there was “clearly” commercial success, ' testifying that “Samsung has sold over 7 and a half million devices that use this technique.” J.A. 12918:6-9. Apple introduced survey evidence comparing the willingness of users to' buy devices containing the patented feature versus those without. J.A. 51440. This survey indicated a heightened willingness to buy devices with the '172 patent’s patented feature. Dr. Cockburn also testified that Samsung’s internal documents and comments from carriers were evidence of industry praise. J.A. 12918:10-13. Dr. Cockburn testified that one such internal Samsung document, J.A. 51488, reflected T-Mobile’s request that Samsung modify its autocorrect technology to adopt the functionality of claim 18. J.A. 68 (citing 4/4/14 Tr. at 698-700). A reasonable jury could have construed evidence that Samsung’s carrier customer requested Samsung adopt the claimed technology as praise of the claimed feature,
The jury determined that Samsung did not prove by clear and convincing evidence that claim 18 was invalid. J.A, 40874. The district court determined that substantial evidence supported the jury’s implicit fact findings on each Graham factor and that “[i]n light of the jury’s factual findings, this Court cannot conclude that there is clear and convincing evidence that it would have been obvious, as a matter of law, to bridge the gaps between the prior art and claim 18.” J.A. 69. The district court reasoned that the jury impliedly found Dr. Cockburn’s testimony that Robinson and Xrgomics did not disclose all the elements of claim 18 more credible than Dr. Wig-dor’s opinion, and the jury impliedly accepted Apple’s evidence of objective indicia of non-obviousness over Dr. Wigdor’s testimony that no such evidence existed. J.A. 67-68. The district court held that these presumed fact findings were supported by substantial evidence and denied Samsung’s motion for JMOL. Id. We see no error in the district court’s weighing of the Graham factors.
Samsung does not appeal the jury’s finding that Apple’s evidence of objective indicia supports nonobviousness. Samsung’s only mention of the objective indi-cia with regard to the '172 patent in its opening brief appears in a footnote which in its entirety reads: “For the same reasons discussed with respect to the '.721 *1062 patent (see supra at 37, 86 S.Ct. 684), secondary indicia of non-obviousness are likewise inapplicable to the '172 patent.” Samsung Br. 45 n.5. Samsung’s passing reference to its arguments for an entirely different patent, claiming an entirely different invention, and concerning different evidence, is hardly enough to constitute a meaningful dispute regarding the weight of Apple’s evidence of objective indicia of nonobviousness or the jury’s fact findings in favor of Apple. Apple presented evidence of commercial success and industry praise for the '172 patented invention, which supports non-obviousness. Samsung did not dispute this evidence or the jury fact findings related to them on appeal.
Apple also presented substantial evidence on which a reasonable jury could find that the combination of Robinson and Xrgomics failed to disclose every claimed element. Apple’s expert, Dr. Cockburn, testified that neither Robinson nor Xrgom-ics disclose that “the current character string in the first area is replaced with the suggested replacement character string,” and that Robinson does not disclose replacing text at all. See J.A. 12915:24-12916:15 (testifying that Robinson does not disclose a “current character string in the first area,” replacing text in the first area, or keeping text in the first area); J.A. 12916:19-12917:17 (testifying that Xrgom-ics does not disclose text replacement at all, but teaches text completion). While Samsung’s expert provided contrary testimony, as the district court observed, with conflicting expert testimony before it, “the jury was free to ‘make credibility determinations and believe the witness it considers more trustworthy.’ ” J.A. 68 (quoting Kinetic Concepts, 688 F.3d at 1362 (citation omitted)). By finding in favor of Apple, the jury impliedly found Apple’s expert’s testimony more credible and persuasive than the testimony proffered by Samsung. Kinetic Concepts, 688 F.3d at 1362; Mobi-leMedia, 780 F.3d at 1168. This evidence, together with Apple’s evidence of objective indicia of non-obviousness, weigh in favor of the legal conclusion that Samsung did not prove by clear and convincing evidence that claim 18 would have been obvious to a skilled artisan.
Even in cases in which a court concludes that a reasonable jury could have found some facts differently, the verdict must be sustained if it is supported by substantial evidence on the record that was before the jury. But as an appellate court, it is beyond our role to reweigh the evidence or consider what the record might have supported, or investigate potential arguments that were not meaningfully raised. Our review is limited to whether fact findings made and challenged on appeal are supported by substantial evidence in the record, and if so, whether those fact findings support the legal conclusion of obviousness. We agree with the district court that there is substantial evidence for a reasonable jury to have found that there was a gap in the prior art that was not filled by the combination of Robinson and Xrgom-ics, and that the entirety of the evidence weighs in favor of nonobviousness. We cannot conclude that the evidence affords only one reasonable conclusion contrary to that of the jury. See Monroe, 248 F.3d at 861. Weighing the Graham factors, we agree with the district court that Samsung failed to establish by clear and convincing evidence that claim 18 of the '172 patent would have been obvious. We thus affirm the district court’s denial of Samsung’s motion for JMOL.
2. Claim Construction & Infringement
In a single page in its opening brief, Samsung argues that the district court erred when it construed the term “a keyboard and a touchscreen display” in claim 18 to encompass both physical and virtual *1063 keyboards. We disagree. The district court determined that the plain and ordinary meaning of the term “keyboard” as used in claim 18 and throughout the specification included both physical and virtual keyboards. J.A. 162-63. The specification of the '172 patent discloses graphical user interfaces containing both virtual and physical keyboards. See '172 patent at 7:13-15, 7:33-35 (describing embodiments containing “a virtual or soft keyboard” or “physical keyboard”). The specification expressly contemplates keyboards that are part of the touchscreen. See, e.g., id. at 4:11-12 (“The user interfaces may include one or more keyboard embodiments displayed on a touch screen.”); id. at 5:38-39 (“The touch screen 112 may be used to implement virtual or soft buttons and/or one or more keyboards.”); id. at 7:10-15 (describing a touch screen containing a virtual or soft keyboard). As recognized by the district court, every figure in the '172 patent that depicts a portable electronic device, as recited in the preamble of claim 18, includes a virtual keyboard. J.A. 162 (citing '172 patent at figs. 2, 4A-4I, 5A-5B). And the specification describes Figure 2, which has a 'virtual keyboard, as “a portable electronic device having a touch screen and a soft keyboard.” '172 patent at 3:15-17 (emphasis added). We see no error in the district court’s construction.
Because Samsung concedes that its accused devices contain a virtual keyboard and does not otherwise dispute infringement of claim 18, we affirm the court’s grant of summary judgment that Samsung’s accused devices infringe claim 18 of the '172 patent.
IV. Conclusion
We affirm and reinstate the district court judgment as to the '647, '721, and '172 patents. We reinstate the portions of the panel decision that pertain to the '959, '414, '239 and '449 patents, for which the panel decision affirmed the district court’s rulings on all issues of those patents. We thus reinstate the district court’s award of costs which the panel had vacated. We remand the willfulness issue for the district court to consider under the Supreme Court’s Halo standard in the first instance.
AFFIRMED
Costs
No costs on this appeal.

. Separately, the jury found that Samsung had not infringed the asserted claims of Apple’s '414 or '959 patents. Additionally, the jury found that Apple had infringed the asserted claim of Samsung’s '449 patent but had not infringed the asserted claim of Samsung’s '239 patent and awarded Samsung $158,400 in damages. We reinstate the panel decision as to the appeals relating to these issues.

. The district court opinion in Motorola— which we affirmed—likewise based its determination of "separate” on the fact that the client and analyzer server are located in different parts of the memory, also citing Figure 1 of the patent: "Had the patent intended the analyzer server to be integrated into the application, rather than separate, the program box would logically appear inside the application box in Figure 1." Apple Inc. v. Motorola Inc., No. 1:11-cv-08540, 2012 WL 12537293, at *6 (N.D. Ill. Mar. 19, 2012).

. The panel opinion also used the extra-record evidence to understand the operation of the accused products. See, e.g., Panel Op. at 9 ("In other words, the software library program runs as part of the client program. See Program library (software library), Dictionary of Computing 391 (4th ed. 1996) ("Usually it is only necessary to reference the library program to cause it to be automatically incorporated in a user’s program.”) (emphasis added).”); id. at 10-11 n.5 ("A client/server relationship assumes a 'clean separation of functions'—both the client and the server are independently operating programs, each performing separate functions. See, e.g., Stephen L. Montgomery, Object-Oriented Information Engineering: Analysis, Design, and Implementation 265 (1994).”). Apple argues that portions of the same extra-record evidence not cited by the panel support Apple's position. We make no findings regarding the teachings of the extra-record evidence.

. Samsung did not argue that the Motorola construction should be expanded or modified to require that the "analyzer server” "run separately” or "stand alone” from the client application. The only instances where Motorola uses the word “separate” are when describing locations, such as "separate parts of a random-access memory (RAM)” or describing the analyzer server and client application as "separate structures.” Motorola, 757 F.3d at 1304-05. Both parties tried the case and presented appellate arguments based on this understanding.

. Two of the dissents argue Apple agreed to the panel’s construction that the analyzer server must "run on its own.” Prost Dissent at 1073-74; Dyk Dissent at 1085. We note that Judge Reyna’s dissent does not address this issue.

. See also Oral Arg. at 28:45 ("There is no requirement that it be stand alone.”); id. at 33:15 ("There is nothing in the claim interpretation that says it has to be stand alone. It says it has to be a separate routine.”); id. at 40:15 ("The question is ... does the claim require a completely standalone, separate routine, and this court’s Motorola interpretation doesn’t require it, and the claim doesn’t require it, but it does require a separate routine.”); id. at 44:00 ("There is no requirement legally that it be a standalone program.”).

. Apple’s counsel explained that to require the analyzer server to be a standalone program “would be taking the claim interpretation that was given in the Motorola case and reinterpreting it to require something more specific.” Id. at 44:00; see id. at 46:05-46:25 (“Court: The question is what does the claim interpretation mean? Apple: No your honor, they haven’t raised that issue. There is no issue of claim interpretation, there is no issue of whether it was incorrect, there is no issue of whether it was given. The only question is, on that charge, was there substantial evidence to support the jury’s decision.”).

. See Apple Pet. 6 ("[T]he panel relied on non-record sources to make its own finding as to [server's] plain meaning. Specifically, the panel ruled that 'servers’ must be “standalone programs’ that run separately.’ ”); id. at 7 n.4 ("But Apple’s counsel was clear that '[t]here is no requirement that [the analyzer server] be standalone. The requirement is that it be a separate routine.’ ”) (alterations in original).

. Two of the dissents allege that the library programs cannot satisfy the analyzer server limitation despite the fact that they are separate programs which perform detecting and linking actions in response to a client request as required by the claims. Prost Dissent at 1073-74; Dyk Dissent at 1085. The claim language plainly indicates that the client application uses the analyzer server to perform the linking and detecting functions, See '647 patent claim 1. Samsung argued it did not infringe because of where the shared library code was used (whether it was copied into the client application before use), not whether it was used by the client application. See, e.g., Samsung Br. 17, 18, 19, 21-22, 24. The concept that the analyzer server must be "standalone” or "run on its own” or run in isolation apart from a client request has no foundation in the '647 patent, in our prior Motorola decision, or in the parties briefs on appeal to this court.

. We leave credibility issues to the jury. We note that the district court repeatedly mentioned that Samsung’s expert Dr, Jeffay, gave inconsistent testimony about a particular limitation. See, e.g., 4/28/14 Tr. at 3058:6-10 ("[Dr. Jeffay has] been all over the map about what the plain and ordinary meaning of this term is .... He's been all over the map.”); id. at 3059:2-3 (“He's all over the map on plain and ordinary meaning of analyzer server.”); id. at 3063:17 ("I think that is contrary to how he just testified.”); id. at 3072:17-18 (“What’s been testified to thus far is misleading.”); id. at 3073:13-17; id. at 3076:7-9 (“He was all over the map, he didn't give an opinion on plain and ordinary meaning of analyzer server, he’s very inconsistent throughout.”). The district court also scolded Dr. Jeffay in its JMOL order for “misleadingly” attempting to argue he had used the Motorola constructions "since the very first day I worked on this case.” J.A. 43. A reasonable jury could have concluded that such inconsistencies negatively impacted the persuasiveness of Dr. Jeffay’s opinions.

. Dr. Mowry testified that “the names [of the subroutines] are a little different” depending on the version of the accused product. J.A. 10862:16-20.

. Samsung also argues the “specified connection” must be in place before the user selects a command to begin operations on a detected structure. Samsung Br. 31-32. This timing argument is premised on Samsung’s contention that startActivity() does not satisfy the specified connection limitation. Because we conclude that there is substantial record evidence for this jury finding, the timing argument necessarily fails. Regardless, we see no timing limitation in the claim, and construction of this claim was not appealed.

. Even though no secondary considerations were argued to the Supreme Court in KSR with regard to obviousness, the Court explains: “Graham sets forth a broad inquiry and invited courts, where appropriate, to look at any secondary considerations that would prove instructive." KSR, 550 U.S. at 415, 127 S.Ct. 1727.

. There does not appear to be a dispute between the parties over whether the two references are prior art and within the analogous arts. Of course, concluding that the references are within the scope and content of the prior art to be considered for obviousness does not end the inquiry. Graham makes clear that the obviousness inquiry requires a determination whether the claimed invention would have been obvious to a skilled artisan.

. The district court denied JMOL on two discrete bases. J.A. 54-56. Because we 'find substantial evidence support for the jury’s fact finding regarding motivation to combine, we need not reach the issue of whether Plaisant teaches away from the combination. We note, however, that, even if. Plaisant does not teach away, its statements regarding users preferring other forms of switches are relevant to a finding regarding whether a- skilled artisan would be motivated to combine the slider toggle in Plaisant with the mobile phone in Neonode.

. In its reply.brief, Samsung argues that Apple’s survey evidence "did not even test the '721 patent for smartphones.” Samsung Resp. Br. 21. The claims of the '721 patent, however, are not directed to a smartphone, but rather to a “hand-held electronic device.” J.A. 685. Apple’s survey evidence tested tablets with 7" ' screens. No one argued that a 7" tablet was not a "hand-held electronic device,” nor does this distinction have anything to do with the slide to unlock feature. The dissents suggest that the survey evidence should be rejected because the survey only establishes that customers. would prefer to purchase a device with a slide-to-unlock feature and that such evidence does not demonstrate a nexus to Apple's particular slide-to-urilock mechanism. We decline to reach this argument because it was never made in this appeal.

. We have previously recognized that a finding of nexus between the commercial success of a product and the merits of the patented invention embodied in that product can be undermined by factors external to the patented invention, such as marketing and advertising. See, e.g., Brown & Williamson Tobacco Corp. v. Philip Morris Inc., 229 F.3d 1120, 1129-30 (Fed. Cir. 2000); In re Paulsen, 30 F.3d 1475, 1482 (Fed. Cir. 1994). Unlike the present facts, however, those cases did not involve an advertising campaign that specifically stressed and highlighted the patented feature as a way to introduce a new, complex product to the public.

. This is how the inventor described the problem to be solved:
Q: What was the problem that you guys were working on at the time that you came up with the '721 invention?.
A: ,. We were worried about accidental use, pocket dialling [sic], the phone getting shut down accidentally, or since we were going to have all these features on the phone, like e-mail.and messaging, we were worried that, you know, mail, could be sent accidentally or deleted accidentally or the phone would answer itself simply because the touch surface—you know, if it was like, like, the touch surface against your leg in your pocket, we were worried that just, like, you know, jostling around, moving around would trigger things on the screen.
J.A, 10600:17-10601:13 (Greg Christie).